13 CV 3409

JUDGE CROTTY

Bruce D. Greenberg
Mayra V. Tarantino (MT2389)
Jeffrey A. Shooman (JS8207)
**LITE DEPALMA GREENBERG, LLC**
Two Gateway Center, Suite 1201
Newark, NJ 07102
Tel: 973-623-3000
Fax: 973-877-3872
bgreenberg@litedepalma.com
mtarantino@litedepalma.com
jshooman@litedepalma.com

Tina Wolfson, SBN 174806
Robert Ahdoot, SBN 172098
**AHDOOT & WOLFSON, P.C.**
10850 Wilshire Boulevard, Suite 370
Los Angeles, California 90024
Tel: 310-474-9111
Fax: 310-474-8585
twolfson@ahdootwolfson.com
rahdoot@ahdootwolfson.com

Timothy G. Blood, SBN 149343
Leslie E. Hurst, SBN 178432
**BLOOD, HURST & O'REARDON, LLP**
701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619-338-1100
Fax: 619-338-1101
tblood@bholaw.com
lhurst@bholaw.com

RECEIVED MAY 21 2013 U.S.D.C. S.D. N.Y. CASHIERS

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ADRIANNA AULT, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>J. M. SMUCKER CO., an Ohio corporation, and DOES 1-50,<br><br>Defendants | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br>JURY TRIAL DEMANDED |

CLASS ACTION COMPLAINT

Plaintiff Adrianna Ault, by and through her counsel, brings this Class Action Complaint against J. M. Smucker Co., on behalf of herself and all others similarly situated, and alleges, upon personal knowledge as to her own actions and her counsel's investigations, and upon information and belief as to all other matters, as follows:

## NATURE OF THE CASE

1. This is a consumer protection and false advertising class action. Defendant J. M. Smucker Co. ("Smuckers" or "Defendant") markets, advertises, and distributes various cooking oils under the Crisco brand name, which it prominently advertises as "all natural." The cooking oils at issue include Crisco Pure Vegetable Oil, Crisco Pure Canola Oil, Crisco Pure Corn Oil, and Crisco Natural Blend Oil (collectively, the "Products"). These oils are not natural at all, for two independent reasons. First, the Products are made with genetically modified crops. A genetically modified ("GM") crop, such as the corn, soy, and rapeseed (canola) from which the Products are derived, is a crop whose genetic material has been altered by humans using genetic engineering techniques. The World Health Organization defines GM organisms (which include crops) as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally." GM crops are not natural, but man-made. There are wide-ranging controversies related to GM crops, including health risks from ingesting GM foods and negative environmental effects associated with growing GM crops. The use and labeling of GM foods is the subject of a variety of laws, regulations, and protocols worldwide. Second, the Products are so heavily processed that they bear no chemical resemblance to the ingredients from which they were derived. Through heavy industrialized processing, Crisco oils have become man-made, rather than natural. Ironically, the GM attributes of the ingredients persist after this heavy processing because the changes are chemical, and not genetic.

2. Although the Products are not "all natural," or natural at all, Defendant prominently labels every bottle of the Products sold in the United States as "all natural." Defendant does this because consumers perceive all natural foods as better, healthier, and more wholesome. In fact, the market for all natural foods has grown rapidly in recent years, a trend for which Defendant seeks to take advantage through false advertising.

3. Plaintiff brings claims against Defendant individually and on behalf of a nationwide class of all other similarly situated purchasers of the Products for violations of New York's General Business Law §§ 349 and 350, and a breach of express warranties. Plaintiff seeks an order requiring Defendant to, among other things: (1) cease the unlawful marketing; (2) conduct a corrective advertising campaign; and (3) pay damages and restitution to Plaintiff and Class members in the amounts paid to purchase the products at issue.

## JURISDICTION AND VENUE

4. The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2), because the proposed class has more than 100 members, the class contains at least one member of diverse citizenship from Defendant, and the amount in controversy exceeds $5 million.

5. The Court has personal jurisdiction over Defendant because Defendant is authorized to, and conducts, substantial business in New York, generally, and this District, specifically. Defendant has marketed, promoted, distributed, and sold the Products in New York.

6. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)(1), because a substantial part of the events and omissions giving rise to this action occurred in this District as Defendant distributes the Products for sale within this District.

7. Intradistrict Assignment: Pursuant to Civil Local Rule 18(a), a substantial part of the events or omissions which give rise to the claims occurred in New York County, and it is therefore appropriate to assign this action to Manhattan.

## PARTIES

8. Plaintiff Adrianna Ault is a resident of New York, New York. Ms. Ault has purchased several Products in New York, New York over the past four years in reliance on Defendant's representations that the Products were "All Natural." Most recently, Ms. Ault purchased a 16 ounce bottle Pure Crisco Canola Oil in February, 2013 for $2.99 at the D&S Met Food Market located at 160 E. 110th St., New York, NY. Prominently on the label appeared the words "All Natural." This representation was material to Ms. Ault's decision to make the purchases. Ms. Ault was willing to pay for the Products because of the representations that they were "all natural" and would not have purchased the Products, would not have paid as much for the Products, or would have purchased

alternative products in absence of the representations. As a result of purchasing a product in reliance on advertising that was false, Ms. Ault has suffered injury in fact and lost money as a result of the unfair business practiced alleged here.

9.  Defendant J. M. Smucker Co. is an Ohio corporation with its principal place of business at 1 Strawberry Lane, Orrville, Ohio 44667. Defendant manufactures and distributes the Products from its manufacturing plant in Ohio to consumers in New York and throughout the United States.

## SUBSTANTIVE ALLEGATIONS

### Defendant Deceptively Labels The Products As "All Natural"

10.  This case concerns four types of Crisco branded cooking oil. Throughout the Class Period, Defendant has prominently labeled and otherwise advertised the Products as "all natural."

11.  Crisco "Pure Vegetable Oil" is made from highly processed soybean oil. Typically, Crisco Pure Vegetable Oil is available in 16 fl. oz., 32 fl. oz., 48 fl. oz., 64 fl. oz., and 1 gallon sizes and retails from approximately $2.48 for the 16 fluid ounce size to approximately $19.99 for the 1 gallon size. Defendant prominently labels its Pure Vegetable Oil as "all natural":



12. Crisco "Pure Canola Oil" is made from highly processed rapeseed oil, also known as "canola." Typically, Crisco Pure Canola Oil is available in 16 fl. oz., 32 fl. oz., 48 fl. oz., 64 fl. oz., and 1 gallon sizes and retails from approximately $2.99 for the 16 fluid ounce size to approximately $10.96 for the 1 gallon size. Defendant prominently labels its Pure Canola Oil as "all natural":



13.    Crisco "Pure Corn Oil" is made from highly processed corn oil. Typically, Crisco Pure Corn Oil is available in 32 fl. oz., 48 fl. oz., 64 fl. oz., and 1 gallon sizes and retails from approximately $4.65 for the 32 fluid ounce size to approximately $14.05 for the 1 gallon size. Defendant prominently labels its Pure Corn Oil as "all natural":



14. Crisco "Natural Blend" combines highly processed rapeseed oil (also known as "canola"), sunflower oil, and soybean oil. Typically, Crisco Natural Blend is available in a 48 fluid ounce size and retails for approximately $3.84 to $5.57. Defendant prominently labels its Natural Blend Oil as "all natural":



15. By consistently labeling the Products as "all natural," Defendant ensured that all consumers purchasing the Products were exposed to its "all natural" claim.

### Food Derived From Genetically Modified Organisms Is Not Natural

16. GM crops are not crops occurring in nature, and are not "all natural." They are genetically manipulated from their natural state. Monsanto, one of the largest producers of GM crop seed, defines GM organisms as "Plants or animals that have had their genetic makeup altered to exhibit traits that are not naturally theirs. In general, genes are taken (copied) from one organism that shows a desired trait and transferred into the genetic code of another organism." (http://www.monsanto.com/newsviews/Pages/glossary.aspx#g (last visited May 13, 2013).)

17. This definition is consistent with the World Health Organization, which defines GM organisms as "organisms in which the genetic material (DNA) has been altered in a way that does not occur naturally. The technology is often called 'modern biotechnology' or 'gene technology', sometimes also 'recombinant DNA technology' or 'genetic engineering'. It allows selected individual genes to be transferred from one organism into another, also between non-related species. Such methods are used to create GM plants – which are then used to grow GM food crops." (World Health Organization, 20 Questions on Genetically Modified (GM) Foods at http://www.who.int/foodsafety/publications/biotech/en/20questions_en.pdf (last visited May 13, 2013).)

18. The Environmental Protection Agency has distinguished between conventional breeding of plants "through natural methods, such as cross-pollination" and genetic engineering. (United States Environmental Protection Agency, Prevention, Pesticides and Toxic Substances, Questions & Answers Biotechnology: Final Plant-Pesticide/Plant Incorporated Protectants (PIPs) Rules (Jul. 19, 2001) at http://www.epa.gov/scipoly/biotech/pubs/qanda.pdf ("Conventional breeding is a method in which genes for pesticidal traits are introduced into a plant through natural methods, such as cross-pollination. . . . Genetically engineered plant-incorporated protectants are created through a process that utilizes several different modern scientific techniques to introduce a specific pesticide-producing gene into a plant's DNA genetic material.") (emphasis of "through natural methods" added; remaining emphasis in original) (last visited May 13, 2013)).

19. Romer Labs, a company that provides diagnostic services to the agricultural industry, including tests to detect and determine the existence of GM crops, defines GM crops as "[a]griculturally important plants [that] are often genetically modified by the insertion of DNA material from outside the organism into the plant's DNA sequence, allowing the plant to express novel traits that normally would not appear in nature, such as herbicide or insect resistance. Seed harvested from GMO plants will also contain these modifications." (http://www.romerlabs.com/en/knowledge/gmo/ (last visited May 13, 2013).)

20. As indicated by the definitions above, which come for a wide array of sources, including industry, government, and health organizations, GM crops are not "all natural," and

products made from those crops, including the Products, are not "all natural."

21. Over 70% of U.S. corn, over 90% of U.S. soy, and over 80% of U.S. canola crops are GM. Defendant sources its ingredients from U.S. commodity suppliers who supply GM crops. Large volume food manufacturers who wish to use non-GM ingredients must specifically source their crops, typically from Europe, or undertake the additional step and expense of purchasing and verifying the supply from non-GM growers through identity preservation programs. In most instances, manufacturers who purchase only non-GM crops for their products specifically label the products "non-GMO".

22. Far from laying claim to such an identity preservation protocol, or any other method by which it can claim non-GM ingredient sourcing, Defendant touts the alleged benefits of GMO and admits that it does not engage in any auditing protocol with respect to GM sourcing. In its public "Statement Regarding Genetic Modification," Defendant impliedly, but deceptively, concedes the use of GM ingredients by asserting that they are economical, dependable, of higher quality, safe, and that "[d]ue to expanding use of biotechnology by farmers and commingling of ingredients in storage and shipment, it is possible that some of our products may contain ingredients derived from biotechnology."

23. Defendant's "all natural" representations are false, deceptive, misleading, and unfair to consumers, who are injured in fact by purchasing products that Defendant claims are "all natural" when in fact they are not.

**The Products Are Not Natural Because They Are Highly Processed So They No Longer Retain The Chemical Properties Of The Plants From Which They Originated**

24. Independent of the use of GM crops to manufacturer the Products, Defendant's "all natural" claims are false because the Products are so heavily processed that they no longer are chemically the same as the oils originally extracted. The various processes by which the raw ingredients are converted to these cooking oils render the final Products chemically-derived and non-natural. While they retain the non-natural genetic attributes of the GM crops from which they are sourced, the Products no longer bear any natural chemical resemblance to their source crops as a result of the extensive process by which they are refined.

25. Many types of oil are extracted through processes that allow the oils to retain the chemical composition occurring in nature. Cold pressed olive oil, for example, is produced through a mechanical process of compressing the oil from olives. Chemicals can also be used in the extraction process to obtain a higher yield of oil. However, chemically, the oil at the end of the process is the same as it was at the beginning of the process. In contrast, the processes used to create the Products go well beyond mere extraction techniques, resulting in chemically altered goods.

26. The Products undergo several distinct chemical processes: (1) extraction; (2) alkali-neutralization; (3) bleaching; (4) deodorizing; and (5) conditioning.

27. To extract crude oil from rapeseed, corn, and soybeans, the manufacturer first applies a physical press to the vegetable, which typically extracts a fraction of the extractable oil. Rapeseed oil extraction also requires high temperatures. As part of the extraction process, the vegetables are then treated with Hexane, a carcinogenic chemical linked to cancer and other major health problems in studies conducted on animals, to extract the remaining crude oil. Residual Hexane may be present in the final product.

28. After it has been extracted from the vegetable, the crude oil is neutralized with an alkaline soap solution that separates and removes the free fatty acids ("FFAs"). The soap solution is typically separated from the neutralized oil by centrifugal separation. Potassium Hydroxide, a corrosive acid, is used to facilitate the reaction between the alkaline solution and FFAs.

29. After neutralization, the oil is bleached and deodorized with additional cleaning solutions to lighten the oil's color and minimize its odor.

30. After being bleached and deodorized, cooking oils such as the Products are conditioned by the use of a high-concentration Phosphoric Acid, consumption of which has been linked to lower bone density as well as chronic kidney disease.

## CLASS ACTION ALLEGATIONS

31. Plaintiff seeks relief in her individual capacity and seeks to represent a class consisting of all others who are similarly situated. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b)(3), Plaintiff seeks certification of a class initially defined as follows:

9
CLASS ACTION COMPLAINT

> All consumers who from May 15, 2009 until the date notice is disseminated to the Class (the "Class Period"), purchased the following Crisco Products in New York: (1) Pure Vegetable Oil, (2) Pure Canola Oil, (3) Pure Corn Oil, and (4) Natural Blend Oil.

32. Excluded from the Class are Defendant and its subsidiaries and affiliates, Defendant's executives, board members, legal counsel, the judges and all other court personnel to whom this case is assigned, their immediate families, and those who purchased the Products for the purpose of resale.

33. Numerosity. Fed. R. Civ. P. 23(a)(1). The potential members of the Class as defined are so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not been determined at this time, Plaintiff is informed and believes that many thousands or millions of consumers have purchased the Products.

34. Commonality. Fed. R. Civ. P. 23(a)(2) and (b)(3). There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class members. These common questions of law and fact include, without limitation:

    a. Whether Defendant conveyed to the class that the Products were "all natural";

    b. Whether defendant's claim that the Products are "all natural" is true or false or likely to deceive a reasonable consumer;

    c. Whether Defendant violated New York General Business Law § 349;

    d. Whether Defendant violated New York General Business Law § 350;

    e. Whether Defendant breached an express warranty; and

    f. The nature of the relief, including equitable relief, to which Plaintiff and the Class members are entitled.

35. Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of the Class. Plaintiff and all Class members were exposed to uniform practices and sustained injury arising out of and caused by Defendant's unlawful conduct.

36. Adequacy of Representation. Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the members of the Class. Plaintiff's Counsel are competent and experienced in litigating class actions.

37.     <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims. There will be no difficulty in the management of this action as a class action.

38.     <u>Injunctive and Declaratory Relief</u>. Fed. R. Civ. P. 23(b)(2). Defendant's misrepresentations are uniform as to all members of the Class. Defendant has acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or declaratory relief is appropriate with respect to the Class as a whole.

## FIRST CAUSE OF ACTION

### (New York General Business Law § 349)

39.     Plaintiff incorporates by reference and re-alleges the substantive allegations set forth above.

40.     As fully alleged above, by advertising, marketing, distributing, and/or selling the Products to Plaintiff and Class members, Defendant engaged in and continues to engage in deceptive acts and practices in violation of Section 349 of the New York General Business Law.

41.     As a direct and proximate result of Defendant's violations, Plaintiff suffered injury in fact and lost money.

42.     Plaintiff, on behalf of herself and Class members, seeks equitable relief in the form of an order requiring Defendant to refund Plaintiff and all Class members all monies they paid for the Products.

43.     Plaintiff and Class members seek to enjoin such unlawful deceptive acts and practices as alleged above. Each Class member will be irreparably harmed unless Defendant's unlawful actions are enjoined because Defendant will continue to mislead consumers with its deceptive advertising. Therefore, Plaintiff and Class members request an order prohibiting Defendant from engaging in the alleged misconduct and performing a corrective advertising campaign.

## SECOND CAUSE OF ACTION

### (Violation of New York General Business Law § 350)

44. Plaintiff incorporates by reference and re-alleges the substantive allegations set forth above.

45. Plaintiff brings this claim individually and on behalf of the Class.

46. As fully described above, Defendant engaged in false and misleading marketing and advertising claims by representing that the Products were "All Natural," when in fact they are not, in violation of Section 350 of the New York General Business Law.

47. As set forth above, Defendant engaged in and continues to engage in false advertising by advertising, marketing, distributing, and/or selling the Products to Plaintiff and Class members.

48. As a direct and proximate result of Defendant's violations, Plaintiff suffered injury in fact and lost money.

49. Plaintiff, on behalf of herself and Class members, seeks equitable relief in the form of an order requiring Defendant to refund Plaintiff and all Class members all monies they paid for the Products.

50. Plaintiff and Class members seek to enjoin such unlawful deceptive acts and practices as alleged above. Each Class member will be irreparably harmed unless Defendant's unlawful actions are enjoined because Defendant will continue to mislead consumers with its deceptive advertising. Therefore, Plaintiff and Class members request an order prohibiting Defendant from engaging in the alleged misconduct and performing a corrective advertising campaign.

## THIRD CAUSE OF ACTION

### (Breach of Express Warranty)

51. Plaintiff incorporates by reference and re-alleges the substantive allegations set forth above.

52. Plaintiff brings this claim individually and on behalf of the Class.

CLASS ACTION COMPLAINT

53. Plaintiff and each member of the Class formed a contract with Defendants at the time Plaintiff and the other members of the Class purchased one or more of the Products. The terms of that contract include the promises and affirmations of fact made by Defendant on the packaging of the Products and through the marketing campaign, as described above. The Products' packaging and advertising constitute express warranties, became part of the basis of the bargain, and are part of a standardized contract between Plaintiff and the members of the Class on the one hand, and Defendant on the other.

54. All conditions precedent to Defendants' liability under this contract have been performed by Plaintiff and the Class.

55. Defendant breached the terms of this contract, including the express warranties, with Plaintiff and the Class by not providing the products that could provide the benefits promised, i.e. that the Products were "all natural."

56. As a result of Defendant's breach of its contract, Plaintiff and the Class have been damaged in the amount of the purchase price of any and all of the Products they purchased.

## JURY DEMAND

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in this Complaint, respectfully requests that the Court enter judgment in his favor and against Defendant, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B. Ordering Defendant to pay actual damages (and no less than the statutory minimum damages) and equitable monetary relief to Plaintiff and the other members of the Class;

C. Ordering Defendant to pay punitive damages, as allowable by law, to Plaintiff and the

Case 1:13-cv-03409-PAC   Document 1   Filed 05/21/13   Page 15 of 16

other members of the Class;

D.   Ordering Defendant to pay statutory damages, as allowable by the statutes asserted herein, to Plaintiff and the other members of the Class;

E.   Awarding injunctive relief as permitted by law or equity, including enjoining Defendant from continuing the unlawful practices as set forth herein, and ordering Defendant to engage in a corrective advertising campaign;

F.   Ordering Defendant to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

G.   Ordering Defendant to pay both pre- and post-judgment interest on any amounts awarded; and

H.   Ordering such other and further relief as may be just and proper.


Dated:  May 20, 2013

Respectfully submitted,
LITE DEPALMA GREENBERG, LLC

By: _____
       Jeffrey A. Shooman

Bruce D. Greenberg
Mayra V. Tarantino (MT2389)
Jeffrey A. Shooman (JS8207)
Two Gateway Center, Suite 1201
Newark, NJ 07102
Tel: 973-623-3000
Fax: 973-877-3872


**AHDOOT & WOLFSON, P.C.**

Tina Wolfson
Robert Ahdoot
Theodore W. Maya
Bradley K. King
10850 Wilshire Blvd., Suite 370
Los Angeles, California 90024
Tel: 310-474-9111
Fax: 310-474-8585

14
CLASS ACTION COMPLAINT

**BLOOD, HURST & O'REARDON, LLP**

Timothy G. Blood, SBN 149343
Leslie E. Hurst, SBN 178432
701 B Street, Suite 1700
San Diego, CA 92101
Tel: 619-338-1100
Fax: 619-338-1101

*Counsel for Plaintiff and the Proposed Class*